IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KATHLEEN S., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:24CV507 |
| | ) |
| FRANK BISIGNANO, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kathleen S. ("Plaintiff"), proceeding *pro se*, brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security discontinuing her disability benefits under Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

In a decision dated December 8, 2011, the Social Security Administration found Plaintiff disabled under Titles II and XVI of the Act beginning on March 1, 2007, primarily

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

based on Plaintiff's mental impairments including borderline intellectual functioning, and Plaintiff began receiving disability benefits as of that date. (Tr. at 237-43.)[2] The payments were made to her husband as her appointed representative based on the determination that she could not manage payments in her own interest. (Tr. at 243, 445.) However, the agency ceased her benefits in April 2014 after she failed to cooperate with a continuing benefits review and the in-file documentation alone was considered insufficient to evaluate Plaintiff's condition. (Tr. at 45, 246-48, 348-57.) Plaintiff appealed the termination of benefits and requested a hearing. Plaintiff failed to appear for both the initial hearing and a rescheduled hearing, and on January 29, 2019, the ALJ issued an unfavorable decision on the record alone. (Tr. at 45, 249-53.) Plaintiff appealed the ALJ's decision, noting various reasons for her failure to cooperate in the review and attend the disability hearings, including a change of address that was not properly updated by the agency. (See also Tr. at 81.) On December 16, 2019, the Appeals Council granted Plaintiff's request for review. (Tr. at 257-58.) In doing so, the Appeals Council explained that "the record upon which the [ALJ] based the decision could not be located" or redeveloped and, because of this, the Appeals Council could not determine whether the ALJ's decision was supported by substantial evidence. (Tr. at 257.) Accordingly, Plaintiff was given the opportunity for a new hearing, as well as the opportunity to submit additional evidence. (Tr. at 257.)

On October 5, 2022, Plaintiff, along with her husband, who served as her non-attorney representative, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 45, 62-127.) Following the hearing, the ALJ concluded that

---

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #6].

2

by April 1, 2014, there had been a decrease in severity of her impairments such that she no longer had any impairments that affected her ability to work. (Tr. at 48-54.) The ALJ therefore founds that her disability ended on April 1, 2014, and that she had not become disabled again since that date. (Tr. at 53.) On April 22, 2024, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-7.)

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

3

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the [claimant] is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

Notably, after a claimant qualifies for benefits under the Act, the decision to award benefits remains subject to a periodic continuing disability review, see 20 C.F.R. § 416.989, in which the agency utilizes the prior determination granting benefits — the comparison point decision ("CPD") — as a reference to evaluate whether any medical improvement has occurred relating to the claimant's ability to work, see 42 U.S.C. § 423(f); 20 C.F.R. § 416.994(b)(1)(vii). To make this determination, the Commissioner employs the following, seven-step evaluation:

1) Do the claimant's impairments meet or medically equal the severity of any listed impairments?

2) If not, has there been any medical improvement in the severity of the claimant's impairments?

3) If medical improvement has occurred, does such improvement relate to the claimant's ability to work?

4) If no medical improvement has occurred, does an exception apply?

5) If medical improvement relates to the claimant's ability to work, do the claimant's current impairments, singly or in combination, qualify as severe?

6) If severe impairments exist, does the claimant's RFC permit the performance of past relevant work?

7) If not, does the claimant have the RFC to perform other work existing in significant numbers in the national economy?

See 20 C.F.R. § 416.994(b)(5). If the claimant can do her past work or other work, the ALJ will determine that her disability has ended. Id.

As with the initial disability review, the issue before court remains whether the ALJ's findings are supported by substantial evidence and were reached based upon a correct application of the law. Craig, 76 F.3d at 589.

III. DISCUSSION

In the present case, the ALJ first noted that in Plaintiff's prior, favorable December 8, 2011 comparison point decision, Plaintiff's disability stemmed from the following severe impairments:

> low back pain, dizziness, headaches, borderline intellectual functioning, agoraphobia, social phobia and adjustment disorder with anxiety, and depression[.]

(Tr. at 47.) At that time, these impairments resulted in an RFC which precluded substantial gainful employment because she "lack(ed) the ability to complete even simple tasks on a sustained basis." (Tr. at 47.) That prior 2011 decision noted that Plaintiff had a Full-Scale IQ score of 72, with agoraphobia, social phobia, adjustment disorder, and borderline intellectual functioning. (Tr. at 240.) That 2011 decision further noted that the results of a consultative psychological examination reflected that Plaintiff was precluded from all work activity, and the RFC determination reflected that she had "no tolerance for any work stress" and "she lacks the ability to complete even simple tasks on a sustained basis for an 8-hour workday or 40 hour workweek." (Tr. at 240-41.) As noted above, Plaintiff's husband was appointed as her

7

Case 1:24-cv-00507-JEP     Document 15     Filed 09/30/25     Page 7 of 18

representative to receive her disability payments because she could not manage the payments in her own interest.

In the present 2023 decision on appeal in this case, the ALJ determined that, based on the updated record, medical improvement occurred on April 1, 2014. (Tr. at 48.) In making this finding, the ALJ pointed only to the fact that "the record indicates a large gap in treatment with no treatment taking place from around 2011 to 2018." (Tr. at 48.) The ALJ further found that, "[s]ince April 1, 2014, [Plaintiff's] impairments have not caused more than a minimal impact on [her] ability to perform basic work activities. Therefore, [Plaintiff] no longer has a severe impairment or combination of impairments." (Tr. at 48.) Accordingly, the ALJ concluded that Plaintiff's "disability ended on April 1, 2014, and [that she] has not become disabled again since that date." (Tr. at 53.)

Plaintiff now raises seven challenges to the ALJ's decision. Specifically, Plaintiff contends that (1) "the SSA's failure to include SS Form 561-U2 and other key documents in the record violated [Plaintiff's] due process rights," (2) "the ALJ failed to properly consider [Plaintiff's] verbal good cause for failing to cooperate at the initial level and reconsideration, especially given the documented change of address and personal hardships," (3) "the ALJ improperly assessed [Plaintiff's] RFC, given her documented impairments, including cervical stenosis, lumbar stenosis, depression, and cancer," (4) "the ALJ erred by failing to obtain updated medical opinions from the state agency consultants, especially given [Plaintiff's] significant impairments from 2017-2023," (5) "the ALJ's finding of medical improvement as of April 2014 was [not] based on substantial evidence," (6) "the ALJ improperly refused to accept evidence from [Plaintiff's] representative during the August 2015 hearing, violating her

8

right to a full and fair hearing," and (7) "the court should reopen the case due to inaccuracies in the October 2022 transcript and the failure to provide a functional audio recording for review." (Pl.'s Br. [Doc. #12] at 2-3.)

As noted above, the case was before the ALJ in 2023 because the Appeals Council had previously remanded this matter in 2019 after concluding that "the record upon which the [ALJ] based the decision could not be located" or redeveloped. (Tr. at 257.) The issue of whether the record before the ALJ on remand was both (1) complete and (2) accurately reflected Plaintiff's condition post April 1, 2014 therefore lies at the heart of the case now before the Court.

Notably, given the inability to locate the record, Plaintiff was to be provided the opportunity to submit evidence to the ALJ in the context of that hearing so that the record could be redeveloped "including any available medical evidence." (Tr. at 257.) However, the hearing transcript reflects significant confusion regarding the submission of such evidence. The confusion began with the appointment of Plaintiff's husband, Alan Scales, as her non-attorney representative. Mr. Scales apparently served in this capacity during Plaintiff's initial hearing eleven years earlier, but had not completed new paperwork to serve as his wife's representative in the present termination case. (Tr. at 66-67.) The ALJ also noted that, "to be a representative, a non-attorney representative, you must be a qualified person that understands [the] rules and regulations of Social Security, the disability laws." (Tr. at 67.) She also indicated that she "was assuming that [Mr. Scales] had other cases," although Mr. Scales made clear that he did not represent any other people in social security cases and that he had never been paid for his work as a representative. (Tr. at 66-68.) Nevertheless, Plaintiff

9

indicated that she wanted her husband to represent her, and the ALJ allowed him to act in this capacity during the hearing. (Tr. at 69.)

Unfortunately, Mr. Scales initially failed to discern the difference between submitting actual medical records rather than just the requests or releases for those records. He was also unaware of his duty, as his wife's representative, to submit requests directly to the providers:

> REP: Yeah, five business days before we sent the records, and prior to that, we sent records. As well as that, we sent some records on – let me see the date here –August 12, and this is –it was sent certified mail. It was accepted by an individual [at the Concord Social Security Office] at 3:16 p.m.
>
> ALJ: All right. If it – is that actual records or was that the –
>
> REP: It was records, ma'am. It was –
>
> ALJ: Okay.
>
> REP: -- medical records.
>
> ALJ: For which –
>
> CLMT: It was medical release records.
>
> REP: A medical release form, medical records. It was what you asked for in your letter.[5]
>
> ALJ: Okay. I do – I see the release. I see a list of recent medical treatment, but I don't see actual medical records. . . . Do you understand the difference?
>
> CLMT: I don't know. I didn't submit the medical records. I just –
>
> REP: She submitted, you know . . . the release form for you to receive the medical records . . . you know, yourself.

---

[5] In a letter to Plaintiff dated March 11, 2020, Plaintiff was provided with Notice of the Appeals Council remand and the setting of the hearing, and was informed that she needed to "inform us about or submit all evidence known to you", that "[y]our representative must help you inform us about or submit the evidence," and that "[w]e can help you get evidence. If you need help, contact our office, your local Social Security office, or your representative (if you appoint one) immediately." (Tr. at 377-78.)

ALJ: [A]gain, as representative, you would've been responsible for making a good faith effort to submit those . . . and exhaust all efforts before we would request them.

REP: Yeah, well, when you're requesting a medical record, you also need some type of formal authority to get that done. . . .

ALJ: [A]re you saying for me to request them, and then –

REP: Yeah, yeah, you to request them.

ALJ: [I] was expecting that they would come in from you, as the . . . representative before the hearing and not just saying, I went to these providers. You order it for me, okay?

REP: Well . . . we called here to get further instructions, [but] we didn't get it . . . and we was told that we was real busy and that you would call back, and we just got – we was connected to voicemails, saying we'll get back to you. Leave a message; we'll get back. So no one came back so we was really stuck at what do you do then? So we sent in what we could, and we sent the form in. We sent that in, like I said, August 12, so that's like last month. I mean, you know, it's plenty of time to call . . . and say, well, you really need to do that yourself . . . but we didn't get a letter.

ALJ: [B]ecause you were already listed as a representative, there would be – the assumption was that you were familiar with the procedures.

REP: Yeah, I'm – well, we were familiar with the procedures, but it's been like seven years . . . she's been going ongoing, and procedures change. . . . And that's one of the procedures that is changed. The other . . . Judge, he ordered the medical records. . . .

ALJ: Well, back in, what, 11 years ago or so, right?

REP: Yeah. Yeah. That's why I said, everything changes. . . . And until we know that, then we don't know . . . and so we have to wait and then ask them. Like we said, we called on the phone and tried to get information but were always put on hold and said that we'd be [] in contact with [you] later . . . and we never got a call back.

ALJ: I – and I appreciate that, certainly.

(Tr. at 70-74.) Later in the hearing, the ALJ returned to the issue of medical records and their submission:

> ALJ: Well, let's go back. Are there any records actually missing? I believe, like the neuro – I believe we requested that.
>
> REP: Yeah.
>
> ALJ: Let's see. So is there anything since – there is really very little, 20, 30 pages, since April of 2014.
>
> REP: Well, it's more than that, Your Honor. I mean, it's – like I said, it – you will have to actually get the actual doctor's records. Like you said, you've only got summaries and all that stuff from the doctor that she – saying that she was going to the doctor. Now, when we gave the Authorization to Disclose Information to the Social Security Administration, that was for the administration itself to pull all the records and giving her permission for them to pull all the records, and they would've been able to pull every record from 2014 all the way to today.
>
> ALJ: Well, I need to know from whom to request those records, so tell me which providers --
>
> REP: It would be –
>
> CLMT: You could just say Novant Health and –
>
> REP: Yeah, Novant Health.
>
> CLMT: Novant Health as the most recent hospital that I have attended. I went to Atrium and – up until 2020. Then, I went to Novant. So Novant has the most –
>
> REP: The recent, but then you also got Atrium, who also has her records, so if it's a fact of just giving the authorization and – with her permission to get that pulled so that you will have an accurate record from doctors or experience experts at that field.
>
> ALJ: Okay. . . . So anywhere else that is not reflected in the – any other providers, other than those, since '14?

>   [CLMT:] Yes, I went to the eye doctor and got – well, two eye doctors, and one told me I had macular degeneration, and the, in June, I went to another one, and they told me I had lattice degeneration and a cataract on my left eye, and –
>
>   [ALJ:] Okay. So who – where did you go, so I know who to request records from?
>
>   [CLMT:] It's one – it's in Concord. I don't have the name. . . .
>
>   ALJ: Okay. Well, we're – we can move on with that. You can let me know after the hearing.
>
>   REP: Okay.
>
>   CLMT: Okay.
>   . . . .
>   ALJ: [W]hen we're done with today's hearing, I'll put the matter into what's called post hearing status. . . . And then, because we have . . . the recent updated authorization for us to request records on your behalf, . . . I'll request records from Novant Health and Atrium. . . . [and] you can let us know . . . [i]f there's somewhere else that I should request records.
>
>   REP: Okay.
>
>   CLMT: Okay. Sure.
>
>   ALJ: I'll request those with Novant, Atrium. I need to know who the eye doctors were –
>
>   CLMT: Okay.
>
>   ALJ: -- and North Carolina Neuropsych[ology].
>
>   REP: Okay.

(Tr. at 94-98.) The ALJ repeated these her statements regarding the post-hearing status after questioning the vocational expert, again indicating that she would request Plaintiff's medical records and send copies to Plaintiff for review. (Tr. at 117, 121, 124.) The ALJ also re-confirmed that Plaintiff's authorization form for the requests was up to date. (Tr. at 119.) Mr. Scales asked for a fax number to send the names and addresses of any additional providers.

13

(Tr. at 118-20.) The ALJ did not have a fax number to hand, but told Mr. Scales that she was "sure it's one the Notice of hearing [or] some document" he had. (Tr. at 120.)

Plaintiff now argues that, despite the ALJ's assurances that she would request records from all of the identified providers, the ALJ ultimately failed to do so. Accordingly, Plaintiff contends that "[t]he ALJ's decision must be set aside due to the insufficient development of the record and the lack of updated medical evidence." (Pl.'s Br. at 4, 6.) Defendant counters as follows:

> As to Plaintiff's assertion that more recent records exist, she testified that she received treatment from Novant Health and Atrium Health, and underwent a recent neuropsychology examination (Tr. 94-95, 97-98). These notes are in the record (Tr. at 658-719). Thus, contrary to Plaintiff's contention, the ALJ had sufficient evidence before her to make a decision as to whether Plaintiff was disabled on April 1, 2014 and thereafter. She was not required to obtain additional medical evidence given the record before her, and she was not required to further develop the record.

(Def.'s Br. [Doc. #14] at 16.)

However, the treatment notes cited by Defendant are an April 2022 new patient evaluation from NC Neuropsychology (Tr. at 665-719), discussed further below, and a Patient After-Visit Summary from Novant Health for a visit in August 2022, submitted by Mr. Scales on Plaintiff's behalf prior to her 2022 hearing, as evidenced by the MyChart heading and the time and date stamp in the top left corner of each page. (Tr. at 659-64.) No other records from Novant Health are included. Likewise, no updated records from Atrium Health are

14

present in the record at all. There is simply no indication or evidence that the ALJ followed through, as promised, to obtain the medical records and send a copy to Plaintiff to review.[6]

Moreover, the few records provided by Plaintiff clearly indicate that more extensive records do, in fact, exist. For example, Plaintiff's treatment summary from her August 9, 2022 appointment at Novant shows three upcoming appointments in August and September of that year. (Tr. at 661-62.) No further evidence of these appointments appears in the record. Similarly, Plaintiff's patient summary from North Carolina Neuropsychiatry, dated April 29, 2022, reflect that Plaintiff was referred to that clinic by Dr. Robles with Novant Neurology. (Tr. at 668.) Again, no documentation of Plaintiff's neurology appointment appears in the record. In addition, an earlier letter by Plaintiff to SSA included a MyChart summary reflecting a then-upcoming visit scheduled for February 4, 2019, and recent past visits including hospital outpatient visits on December 17, 2018, and August 27, 2018, an office visit on November 12, 2018, telephone visits on November 8, 2018, November 29, 2018, December 21, 2018, and January 4, 2019, and a procedure on December 31, 2018. (Tr. at 374.) None of these records were obtained, but the ALJ then repeatedly relied on the finding that "the record indicates a large gap in treatment with no treatment taking place from around 2011 to 2018" and that "there is no medical evidence from 2011 to 2018." (Tr. at 48, 50.)[7] Plaintiff also submitted a

---

[6] The record does reflect that the ALJ sent Plaintiff a letter identifying a single record, 15F, which was the August 2022 Novant Health Visit. (Tr. at 45, 535.) However, Exhibit 15F was Plaintiff's MyChart summary and was admitted at the hearing. (Tr. at 79, 659-64.)

[7] The ALJ specifically noted that Plaintiff was given a cardiac event monitor to wear in November 2018, related to hypertension and palpitations, based on a single page of the record from Novant Health submitted by Plaintiff. (Tr. at 50, 654.) However, the ALJ found that that "there is no indication she required ongoing treatment for either [palpitations or hypertension] or consistently had ongoing residual symptoms related to hypertension. There is no evidence she returned with complaints of palpitations," (Tr. at 50), but as noted above the ALJ did not obtain any of the treatment records for this time frame from Novant Health.

clinical summary from Carolina Digestive Health Associates dated November 12, 2018, which indicates that she had a colonoscopy in 2017—a year in which the ALJ claimed Plaintiff had no medical treatment—and a record which reflects that she had a hysterectomy during this period. (Tr. at 656, 658.) Specifically, Plaintiff's records prior to 2011 include a radiology report reflecting uterine fibroids. (See, e.g., Tr. at 590.) A later MyChart summary notes a "mass of the uterus" as of May 30, 2018 (Tr. at 12), and Plaintiff later reported that she had an emergency hysterectomy in December 2018 (Tr. at 676). Notably, the only record regarding the hysterectomy is a MyChart patient test report regarding a CT of Plaintiff's pelvis on December 18, 2018, submitted by Plaintiff, which found no "post operative issue" and noted that Plaintiff's uterus was "surgically absent." (Tr. at 658.) This is consistent with Plaintiff's reports of significant gynecological issues and the inclusion of "mass of uterus" and menometrorrhagia on her medical problem list. (See Tr. at 12, 662, 669.) Again, none of the medical records for these visits and hospitalizations are included in the record at all.

Further, with respect to Plaintiff's mental impairments, as noted above the prior 2011 decision found that Plaintiff had a Full-Scale IQ score of 72, with agoraphobia, social phobia, adjustment disorder, and borderline intellectual functioning. (Tr. at 240.) At that time, the results of a consultative psychological examination reflected that Plaintiff was precluded from all work activity, and Plaintiff's husband was appointed as her representative to receive her disability payments because she could not manage the payments in her own interest. At the 2023 hearing, there was no new consultative examination, although at the hearing Plaintiff's husband repeatedly requested a new psychological consultative examination. (Tr. at 89-90.) In addition, the state agency physicians provided no new opinions, noting only that there was

insufficient evidence to make an opinion. (Tr. at 622, 623, 624, 625, 639, 653.)[8] Plaintiff did submit a new patient psychological evaluation from April 2022 that involved multiple days of testing, with resulting diagnostic impressions reflecting "TBI with associated memory and attentional deficits, PTSD, Post Concussional Syndrome, OCD, Agoraphobia, Borderline Intellectual Functioning." (Tr. at 673-74.) The ALJ nevertheless gave little weight to this opinion, based on a lay evaluation of the testing, and the lack of mental health treatment. (Tr. at 52-53.) Again, however, the ALJ did not actually obtain the treatment records to develop the record, nor did the ALJ order any other updated consultative examination or medical review.[9] From the evidence in the record, it is not clear how Plaintiff's significant mental impairments, including borderline intellectual functioning, improved to the point that she had no impairments that significantly limited her ability to perform basic work activities, at least requiring formulation of an RFC, and given the lack of development of the record there is simply no evidence in the record to support that conclusion.

In short, because the ALJ failed to fulfill her duty to request medical records from the two primary medical systems identified by Plaintiff, and failed to obtain any updated consultative examination or other medical review, the administrative record remains incomplete and cannot provide substantial evidence supporting the ALJ's findings. As set out

---

[8] In her brief, Plaintiff specifically contends that "[t]he ALJ erred by failing to seek updated medical opinions from state agency medical and psychological consultants" and that "[t]he ALJ's decision must be set aside due to the insufficient development of the record and the lack of updated medical evidence." (Pl. Br. at 5-6.)

[9] The ALJ also gave little weight to the 2011 consultative examination relied on by the prior 2011 ALJ decision, but it is unclear how this analysis would be appropriate to a determination of improvement since that prior determination. That is, it appears that the ALJ undertook a re-weighing of all of the evidence, without any other medical review, rather than an actual determination of whether Plaintiff's impairments had improved since the prior determination. The Court need not consider that issue further given the other issues discussed above requiring remand in any event.

above, the ALJ assured both Plaintiff and her husband multiple times that the ALJ's office would request all records from Atrium and Novant "directly." (Tr. at 117, 121, 124.) There is no evidence that the ALJ followed through on this promise. The ALJ also denied Plaintiff's request to obtain an updated consultative examination or other medical review. The ALJ nevertheless relied repeatedly on a lack of medical evidence to conclude that Plaintiff's medical condition had improved. These circumstances clearly require remand.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability IS REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner is directed to remand the matter to the ALJ for proceedings consistent with this Order. To this extent, Defendant's Dispositive Brief [Doc. #14] is DENIED, and Plaintiff's Dispositive Brief [Doc. #12] is GRANTED.

This, the 29th day of September, 2025.

/s/ Joi Elizabeth Peake
Joi Elizabeth Peake
United States Magistrate Judge